No. 24-30645

# United States Court of Appeals
# for the Fifth Circuit

ABBVIE, INCORPORATED; ALLERGAN, INCORPORATED; DURATA
THERAPEUTICS, INCORPORATED; ABBVIE PRODUCTS, L.L.C.; APTALIS
PHARMA US, INCORPORATED; ALLERGAN SALES, L.L.C.;
PHARMACYCLICS, L.L.C.,

*Plaintiffs-Appellants*,

v.

LIZ MURRILL, IN HER OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF LOUISIANA,

*Defendant-Appellee,*

LOUISIANA PRIMARY CARE ASSOCIATION,

*Intervenor Defendant-Appellee.*

On Appeal from the United States District Court for the  Western
District of Louisiana, Lafayette Division,
No. 6:23-cv-01307-RRS-CBW, Judge Robert R. Summerhays

## BRIEF FOR APPELLANTS

ASHLEY C. PARRISH
JOHN D. SHAKOW
KING & SPALDING LLP
1700 PENNSYLVANIA AVENUE N.W.
SUITE 900
WASHINGTON, DC 20006
(202) 626-2627
aparrish@kslaw.com

MATTHEW S. OWEN, P.C.
MEREDITH M. POHL
LUCAS H. FUNK
KIRKLAND & ELLIS LLP
1301 PENNSYLVANIA AVENUE N.W.
WASHINGTON, DC 20004
(202) 389-5000
matt.owen@kirkland.com

*Counsel for Appellants*
*Additional Counsel Listed on Next Page*

NICOLE BRONNIMANN
KING & SPALDING LLP
1100 LOUISIANA, SUITE 4100
HOUSTON, TX 77002
(713) 276-7402
nbronniman@kslaw.com

CHARLES M. JARRELL (NO. 17638)
GUGLIELMO, LOPEZ, TUTTLE,
HUNTER & JARRELL, L.L.P.
306 EAST NORTH STREET
P.O. BOX 1329
OPELOUSAS, LA 70571-1329
(337) 948-8201
cjarrell@glthj.com

*Counsel for Appellants*

## CERTIFICATE OF INTERESTED PERSONS

### *AbbVie, et al. v. Murrill*, No. 24-30645

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

## **Plaintiffs-Appellants**

AbbVie Inc. (a Delaware corporation); Allergan, Inc. (a Delaware corporation); Durata Therapeutics, Inc. (a Delaware corporation); AbbVie Products LLC (a Georgia limited liability company); Aptalis Pharma US, Inc. (a Delaware corporation); Pharmacyclics, LLC (a Delaware limited liability company); Allergan Sales, LLC (a Delaware limited liability company).

Allergan, Inc. is 100% owned by Allergan Finance, LLC; Durata Therapeutics, Inc. is 100% owned by Allergan W.C. Holding Inc.; AbbVie Products LLC is 100% owned by AbbVie Inc.; Aptalis Pharma US, Inc. is 100% owned by Allergan Sales, LLC; Pharmacyclics LLC is 100% owned by AbbVie Inc.; Allergan Sales, LLC is 51.8% owned by Allergan

Holdings, Inc. and 48.2% owned by Allergan Holdco US, Inc.; and AbbVie Inc. is the ultimate parent of each of the other aforementioned entities.

## Counsel for Plaintiffs-Appellants

Matthew S. Owen, P.C., Kirkland & Ellis LLP; Meredith M. Pohl, Kirkland & Ellis LLP; Lucas H. Funk, Kirkland & Ellis LLP; Ashley C. Parrish, King & Spalding LLP; John D. Shakow, King & Spalding LLP; Nicole Bronnimann, King & Spalding LLP; Charles M. Jarrell, Guglielmo, Lopez, Tuttle, Hunter & Jarrell, LLP.

## Defendant-Appellee

Liz Murrill, in her official capacity as the Attorney General of the State of Louisiana.

## Counsel for Defendant-Appellee

Jorge Benjamin Aguiñaga, Louisiana Department of Justice; Caitlin Ann Huettemann, Louisiana Department of Justice.

## Intervenor Defendant-Appellee

Louisiana Primary Care Association.

**Counsel for Intervenor Defendant-Appellee**

Ronald S. Connelly, Powers, Pyles, Sutter & Verville, P.C.

*/s/ Matthew S. Owen*
Matthew S. Owen, P.C.
Attorney of Record for Appellants

# STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and Fifth Circuit Rule 28.2.3, Appellants respectfully submit that oral argument will assist the Court in resolving this appeal.  This appeal presents important questions about the extent to which state legislatures may rework the federal 340B scheme to their own ends—questions courts and legislatures are grappling with nationwide.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................i

STATEMENT REGARDING ORAL ARGUMENT ......................... iv

TABLE OF CONTENTS ..................................................... v

TABLE OF AUTHORITIES .............................................. vii

JURISDICTIONAL STATEMENT ........................................ 1

ISSUES PRESENTED ...................................................... 2

INTRODUCTION............................................................ 4

STATEMENT OF THE CASE............................................. 7

    A.    The 340B Pricing Program. ................................. 7

    B.    Contract Pharmacies. ..................................... 12

        1.    HRSA's Contract Pharmacy Guidance. ....... 12

        2.    The Replenishment Model............................ 14

        3.    Manufacturers' Policies and Resulting Litigation. ..... 18

    C.    The Louisiana Law................................... 20

    D.    This Litigation....................................... 21

SUMMARY OF THE ARGUMENT....................................23

STANDARD OF REVIEW..............................................24

ARGUMENT .............................................................26

I.    ACT 358 IS PREEMPTED BY FEDERAL LAW. ...............26

    A.    The 340B Program Preempts the Field. .............26

        1.    Congress Created a Wholly Federal System. ..........27

         2.      Louisiana May Not Tinker with Congress's Policy Decisions in Section 340B...............................................31

   B.    Act 358 Conflicts with the 340B Program. ...........................36

         1.      Act 358 Improperly Expands 340B Obligations Under the 340B Program. ...........................................36

         2.      Act 358 Thwarts Congress's Intent to Vest Exclusive Authority for Enforcing Section 340B in the Federal Government...............................................39

         3.      The District Court Was Wrong to Conclude That Act 358 Is Not Preempted Because It Furthers the 340B Program. .......................................................41

II.   ACT 358 EFFECTUATES AN UNCONSTITUTIONAL TAKING. ............46

   A.    Act 358 Effectuates a Physical Taking. .................................48

   B.    Act 358's Taking Is Not for "Public Use." .............................51

   C.    Act 358's Taking Is Coercive, Not Voluntary.........................57

   D.    The Regulatory Takings Doctrine Does Not Apply, But Even If It Does, AbbVie Still Prevails...................................62

III.  INTERVENTION WAS IMPROPER.....................................................67

CONCLUSION .........................................................................................70

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
 570 U.S. 205 (2013) ............................................................... 62

*Aldridge v. Miss. Dep't of Corr.*,
 990 F.3d 868 (5th Cir. 2021) ............................................... 26

*Arizona v. United States*,
 567 U.S. 387 (2012) ................................... 26, 32, 36, 38, 41

*Astra USA, Inc. v. Santa Clara Cnty., Cal.*,
 563 U.S. 110 (2011) .................................. 10, 11, 29, 30, 32, 39, 66, 67

*AstraZeneca Pharms. LP v. Becerra*,
 543 F. Supp. 3d 47 (D. Del. 2021) .................................... 19, 37

*Baker v. City of McKinney, Tex.*,
 84 F.4th 378 (5th Cir. 2023) ........................................... 46, 47

*Baker v. City of McKinney, Tex.*,
 93 F.4th 251 (5th Cir. 2024) .............................................. 47

*Baker v. Wade*,
 743 F.2d 236 (5th Cir. 1984) ......................................... 25, 68

*Bankhead v. Brown*,
 25 Iowa 540 (1868) ............................................................. 54

*Beneficial Nat'l Bank v. Anderson*,
 539 U.S. 1 (2003) ................................................................ 30

*Buckman Co. v. Plaintiffs' Legal Comm.*,
 531 U.S. 341 (2001) .............................................. 38, 39, 44

*Bush v. Viterna,*
   740 F.2d 350 (5th Cir. 1984) ....................................................... 25, 69

*Calder v. Bull,*
   3 U.S. 386 (1798) ............................................ 23, 46, 47, 53, 55

*Catalyst Strategic Advisors, L.L.C. v. Three Diamond Cap.*
   *Sbc, L.L.C.,*
   93 F.4th 870 (5th Cir. 2024) ................................................ 24

*Cedar Point Nursery v. Hassid,*
   594 U.S. 139 (2021) ...................................... 48, 49, 63, 67

*Crosby v. Nat'l Foreign Trade Council,*
   530 U.S. 363 (2000) ................................................ 40

*Doe v. Duncanville Indep. Sch. Dist.,*
   994 F.2d 160 (5th Cir. 1993) ................................................ 25

*Dufrene v. Video Co-Op, Louisiana Workers' Comp. Corp.,*
   843 So. 2d 1066 (La. 2003). Act 358's ................................. 50

*Hawaii Hous. Auth. v. Midkiff,*
   467 U.S. 229 (1984) ................................................ 56

*Hopwood v. State of Texas,*
   21 F.3d 603 (5th Cir. 1994) ................................................ 68

*Horne v. Dep't of Agric.,*
   576 U.S. 350 (2015) ...................................... 49, 59, 63, 66

*Kelo v. City of New London, Conn.,*
   545 U.S. 469 (2005) ................................................ 52, 55, 56

*Knight v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.,*
   67 F.4th 816 (6th Cir. 2023) ................................................ 60

*Koontz v. St. Johns River Water Mgmt. Dist.,*
   570 U.S. 595 (2013) ................................................ 59

*Lingle v. Chevron U.S.A. Inc.,*
   544 U.S. 528 (2005) ................................................ 47, 65

*McCulloch v. Maryland,*
17 U.S. 316 (1819) ........................................................ 26, 31

*Memphis Freight Co. v. City of Memphis,*
44 Tenn. 419 (1867) ............................................................ 54

*New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.,*
732 F.2d 452 (5th Cir. 1984) ........................................ 25, 68

*Novartis Pharms. Corp. v. Espinosa,*
2021 WL 5161783 (D.D.C. Nov. 5, 2021) ............................ 41

*Novartis Pharms. Corp. v. Johnson,*
102 F.4th 452 (D.C. Cir. 2024) ............. 6, 13, 17, 19, 20, 33, 34, 35, 66

*Penn Central Transp. Co. v. New York City,*
438 U.S. 104 (1978) ................................................ 63, 64, 65

*PhRMA v. McClain,*
95 F.4th 1136 (8th Cir. 2024) ................................... 42, 44, 45

*PhRMA v. Morrisey,*
2024 WL 5147643 (S.D. W. Va. Dec. 17, 2024)
........................................................ 23, 35, 39, 40, 41, 42, 43

*Rapanos v. United States,*
547 U.S. 715 (2006) .................................................... 38, 42

*Rodriguez v. United States,*
480 U.S. 522 (1987) ........................................................... 42

*Ruckelshaus v. Monsanto Co.,*
467 U.S. 986 (1984) ........................................................... 66

*Sanofi Aventis U.S. LLC v. HHS,*
58 F.4th 696 (3d Cir. 2023) ........................ 5, 20, 33, 34, 35, 37, 66

*Sheetz v. Cnty. Of El Dorado, Cal.,*
601 U.S. 267 (2024) .................................................... 60, 61

*U.S. Term Limits, Inc. v. Thornton,*
514 U.S. 779 (1995) ........................................................... 31

*Valancourt Books, LLC v. Garland,*
   82 F.4th 1222 (D.C. Cir. 2023) ............................................................. 59

*Vanhorne's Lessee v. Dorrance,*
   2 U.S. 304 (C.C.D. Pa. 1795)................................................................ 53

*Virginia Hosp. & Healthcare Ass'n v. Roberts,*
   671 F. Supp. 3d 633 (E.D. Va. 2023) ............................................. 57, 58

*Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.,*
   475 U.S. 282 (1986) .............................................................................. 31

*Wood v. Holiday Inns, Inc.,*
   508 F.2d 167 (5th Cir. 1975)................................................................ 45

**Constitutional Provisions**

U.S. Const. amend. V ....................................................................... 46

U.S. Const. art. VI ............................................................................ 26

**Statutes**

28 U.S.C. §1292................................................................................... 1

28 U.S.C. §1331................................................................................... 1

42 U.S.C. §256b........................................................... 4, 7, 8, 9, 10, 27, 28, 40

42 U.S.C. §1396r-8........................................................................ 7, 8

La. Stat. Ann. §40:2882 ...................................................... 20, 35, 43

La. Stat. Ann. §40:2884 ........................................... 6, 20, 40, 43, 49

La. Stat. Ann. §40:2885 ..................................................................... 21

La. Stat. Ann. §51:1401 ..................................................................... 21

La. Stat. Ann. §51:1407 ..................................................................... 21

La. Stat. Ann. §51:1408 ..................................................................... 21

La. Stat. Ann. §51:1417 ........................................................ 17

**Regulations**

42 C.F.R. §10.20 ................................................................... 11

42 C.F.R. §10.21 ............................................................ 11, 28

42 C.F.R. §10.22 ................................................................... 11

42 C.F.R. §10.23 ................................................................... 11

42 C.F.R. §10.24 ................................................................... 11

61 Fed. Reg. 43549 (Aug. 23, 1996) ................................. 12, 45

75 Fed. Reg. 10272 (Mar. 5, 2010) .................................. 12, 13

85 Fed. Reg. 80632 (Dec. 14, 2020) ...................................... 11

89 Fed. Reg. 28643 (Apr. 19, 2024) ................................. 11, 28

**Rules**

Fed. R. App. P. 4 ................................................................... 1

Fed. R. Civ. P. 24 ................................................................ 25

Fed. R. Civ. P. 56(a) ........................................................... 24

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) ................................ 49

Eric R. Claeys, *Public-Use Limitations and Natural Property Rights*, 2004 Mich. St. L. Rev. 877 (2004) ............................. 52

Ilya Somin, *The Grasping Hand* (e-Book) (2015) ............... 52, 54

James Madison, "Property" (1792), in Philip Kurland and Ralph Lerner, eds., The Founders Constitution, (Chicago: University of Chicago Press, 1987) ...................................... 52

John Locke, *Two Treatises of Government and A Letter Concerning Toleration,* ed. Ian Shapiro (Yale University Press, 2003) .......................................................... 53

Martin, Rory, *White Paper: Are Discounts in the 340B Drug Discount Program Being Shared With Patients at Contract Pharmacies* (IQVIA Mkt. Access Ctr. of Excellence 2022) .................. 9

Merriam-Webster Dictionary (Online) .................................................... 49

S. Rep. No. 102-259 (1992) ...................................................... 38

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .......................................................... 50

Thomas Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (Boston: Little, Brown, 1868) .................................. 54

William Blackstone*, Commentaries on the Laws of England* (Chicago: University of Chicago Press, 1979 [1765]) ......................... 53

# JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §1331 because AbbVie brings federal constitutional challenges to a Louisiana state law.  ROA.69-ROA.70 (¶1).  This Court has appellate jurisdiction because AbbVie is appealing a final decision that disposed of all claims against all parties.  28 U.S.C. §1291.  AbbVie timely filed its notice of appeal on October 8, 2024, within 30 days of the district court's order of September 30, 2024.  Fed. R. App. P. 4.

# ISSUES PRESENTED

In 1992, Congress created the 340B Program. That Program requires drug manufacturers, as a condition of their participation in federal Medicaid and Medicare Part B, to offer certain of their drugs at significant discounts to a list of specifically enumerated low-cost healthcare providers. Louisiana's Act 358 grafts new requirements onto that federal statute by compelling AbbVie to give discounted drugs to entities not enumerated in the statute, under more onerous conditions than Congress requires—and in exchange for nothing. The issues presented are:

1. Does Act 358 intrude into an exclusive federal field and conflict with federal law by engrafting new requirements onto the federal 340B statute, expanding manufacturers' obligations beyond the scope delineated by Congress, and changing the conditions of participation in federal healthcare programs?

2. Does Act 358 compel manufacturers to transfer their products at significant discounts to private pharmacies for no public use, in violation of the Takings Clause?

3. Was the intervention of Louisiana Primary Care Association in

this litigation improper?

## INTRODUCTION

The district court's order granting summary judgment to the Attorney General should be reversed. AbbVie seeks to enjoin Louisiana from enforcing its recently enacted Act 358, called the "Defending Affordable Prescription Drug Costs Act." In substance, Act 358 compels AbbVie to transfer its drugs to retail pharmacies at a legislatively set price, with no corresponding public use. In so doing, Louisiana thrusts itself into a wholly federal healthcare regime, where it seeks to revise and reverse Congress's policy decisions in the 340B Program.

The federal 340B Program requires pharmaceutical manufacturers that participate in Medicaid and Medicare Part B to offer their drugs at significant discounts to a list of certain government-approved healthcare providers for the benefit of low-income and uninsured patients. *See* 42 U.S.C. §256b. The 340B statute specifically enumerates the types of providers to which manufacturers must offer these sub-competitive prices (called "covered entities"). *See id.* §256b(a)(4). This list is exclusive: The statute does not require manufacturers to offer these prices to any other entity.

Act 358 arises out of a long-running dispute over the extent of manufacturers' obligations under the federal 340B Program to provide 340B-priced drugs to commercial pharmacies, like Walgreens and CVS, who see the Program's significant discounts as an arbitrage opportunity. Historically, 340B Program guidance recommended that covered entities be permitted to contract with one outside pharmacy (a "contract pharmacy") if the entity itself lacked an in-house pharmacy to dispense medication.    Recently, covered entities (supported by the U.S. Department of Health and Human Resources (HHS)) have taken the position that they may contract with unlimited pharmacies to buy drugs at the 340B discount and have the pharmacies sell them at full price to their customers—thereafter, splitting the arbitrage profits.

Because Congress intended 340B revenues to flow to needy patients—not large, national pharmacy chains—manufacturers like AbbVie have adopted policies with certain limitations on the transfer or sale of their 340B-priced drugs to commercial pharmacies.    Federal courts of appeals are unanimous that the 340B statute empowers manufacturers to adopt such policies.    *See Sanofi Aventis U.S. LLC v.*

*HHS*, 58 F.4th 696, 707 (3d Cir. 2023); *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 464 (D.C. Cir. 2024).

Faced with this reality, several states, including Louisiana, enacted statutes like Act 358 seeking to revise federal law. Louisiana's law—which went into effect in August 2023—instructs that a manufacturer "shall not deny, restrict, prohibit, or otherwise interfere with … the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B entity." La. Stat. Ann. §40:2884(A). The Louisiana statute thus seeks to change the requirements for participating in the federal Program by forcing manufacturers to expand the types of entities to which they are required to transfer their drugs at the federal discounted price. AbbVie sought to enjoin Act 358 on preemption and takings grounds, but the district court granted summary judgment to the State.

The district court's decision was erroneous; Act 358 is unconstitutional twice over.

***First***, Act 358 intrudes into a carefully balanced federal field of interdependent federal healthcare programs and, by upsetting that

6

balance, conflicts with Congress's aims in enacting the 340B Program. The Act is therefore preempted.

***Second***, Act 358 effectuates a physical taking of private property. It forces AbbVie to transfer discounted products to other private parties (commercial pharmacies) against its will. That kind of private-to-private wealth transfer can never serve a "public use." Accordingly, the Act offends the Fifth Amendment's Takings Clause.

## STATEMENT OF THE CASE

### A.    The 340B Pricing Program.

In 1992, Congress enacted Section 340B of the federal Public Health Service Act, establishing what is commonly called the "340B Program." *See* 42 U.S.C. §256b. Put simply, the statute requires pharmaceutical manufacturers to offer their drugs to certain healthcare providers at significantly discounted prices. *Id.*

The Program works as follows: In exchange for coverage under the federal Medicaid and Medicare Part B programs, the statute requires manufacturers to "offer" their products to each "covered entity … for purchase at or below the applicable ceiling price." *Id.* §256b(a)(1); 42 U.S.C. §1396r-8(a)(5)(A). The "ceiling price" is set by a statutory formula

7

and results in massive discounts, ranging from 23.1% to more than 99.9% of the average market price for a given drug—often requiring that manufacturers sell their medicine for as little as one penny per unit. 42 U.S.C. §1396r-8(c); 42 U.S.C. §256b(a)(1). The "covered entit[ies]" include, among others, federally qualified health centers and rural hospitals that (ostensibly) serve low-income communities. 42 U.S.C. §256b(a)(4). The statutorily defined list of "covered entit[ies]" does not include contract pharmacies or any for-profit entity. *Id.*

The federal 340B statute imposes several substantive rules that define the scope of manufacturers' obligations and are designed to protect against abuse.

***First***, the statute prohibits covered entities from transferring or selling drugs they purchased at a 340B discount to anyone who is not a patient of the entity—a practice referred to as "diversion." *Id.* §256b(a)(5)(B). By limiting who can access manufacturers' drugs at the discounted 340B price—limiting sales only to covered entities and their patients—Congress attempted to ensure that the Program did not become a buy-low sell-high scheme for those with a profit motive.

**Second**, covered entities may not generate a state's request for a Medicaid rebate on a unit of drug purchased at a 340B discount—those are forbidden "duplicate discounts." *Id.* §256b(a)(5)(A)(i). Otherwise, a manufacturer would be required to provide two discounts or rebates on the same unit of product.

**Third**, covered entities must permit both the Secretary of HHS and manufacturers to audit any of their records that directly pertain to the entity's compliance with the prohibitions on diversion and duplicate discounting. *Id.* §256b(a)(5)(C).

The 340B statute does not require covered entities to share with patients any part of the discounts they receive from manufacturers, and they rarely do voluntarily. Instead, covered entities overwhelmingly charge patients and their insurance full price for the drugs that they acquire at the discount and pocket the difference (known as "spread"). As further explained below, patients are deprived of any direct benefit from the 340B Program when a covered entity uses a contract pharmacy. Covered entities provide discounts to uninsured and indigent patients *less than 1.5% of the time* when drugs are dispensed through contract pharmacies. Martin, Rory, *White Paper: Are Discounts in the 340B Drug*

9

*Discount Program Being Shared With Patients at Contract Pharmacies*, at 9 (IQVIA Mkt. Access Ctr. of Excellence 2022).

Congress vested HHS with authority to enforce and administer the 340B Program. *Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 120-21 (2011). The agency may impose civil monetary penalties at a rate of $7,034 for each time a manufacturer charges a covered entity above the ceiling price. 42 U.S.C. §256b(d)(1)(B)(vi) (inflation-adjusted). HHS also may sanction covered entities for diversion and duplicate discounting. *Id.* §256b(d)(2)(B)(v).

HHS's enforcement authority is exclusive. *Astra*, 563 U.S. at 117. In *Astra*, the Supreme Court held that, by vesting enforcement authority solely in HHS, Congress withheld from covered entities a private right of action to enforce the 340B Program's requirements against manufacturers. *Id.* "[S]preading the enforcement burden" of the 340B Program "is hardly what Congress contemplated when it 'centralized enforcement in the government.'" *Id.* at 119. Rather, "Congress made HHS administrator of both the Medicaid Drug Rebate Program and the 340B Program" because "the interdependent nature of the two programs' requirements means that an adjudication of rights under one program

10

must proceed with an eye towards any implications for the other." *Id.* at
120. As a result, auxiliary enforcement mechanisms beyond those
contemplated in the statute would "undermine the agency's efforts to
administer both Medicaid and § 340B harmoniously and on a uniform,
nationwide basis." *Id.*

As part of its exclusive enforcement scheme, HHS's component
agency, the Health Resources and Services Administration (HRSA) has
established both an informal "good faith" conferral process and a more
formal process referred to as Administrative Dispute Resolution ("ADR").
If the good-faith conferral process does not resolve the dispute, the next
step is to either ask HRSA to enforce the statute or, for certain specified
claims, proceed through ADR. 85 Fed. Reg. 80632, 80638 (Dec. 14, 2020);
89 Fed. Reg. 28643 (Apr. 19, 2024). HRSA's ADR rule sets out a process
for initiating a claim, 42 C.F.R. §10.21(b), (d), describes the types of
claims permitted, *id.* §10.21(a), the establishment of an "ADR Panel" that
will adjudicate the claim, *id.* §10.20, and the specific procedures that the
ADR Panel will follow, *id.* §§10.21-24. Covered entities have used this
process, including to raise disputes with manufacturers over contract

pharmacies' role in the 340B program. *See, e.g.*, *PhRMA v. Landry*, No. 6:23-cv-00997-RRS-CBW (ECF No. 21-7).

### B.    Contract Pharmacies.

#### 1.    HRSA's Contract Pharmacy Guidance.

In 1996, HRSA issued guidance suggesting that covered entities lacking an in-house dispensing pharmacy should be permitted to contract with a *single* outside pharmacy to dispense 340B-priced drugs to their patients.  61 Fed. Reg. 43549, 43550-55 (Aug. 23, 1996).  But to avoid unlawful diversion, HRSA suggested and assumed that the covered entity would maintain title to those drugs and that the pharmacy would remain an agent of the covered entity.  *Id.*  At that time, HRSA also clarified that this guidance created "no new law" and "no new rights or duties."  *Id.* at 43550.  The 340B Program proceeded accordingly for nearly a decade and a half.

The status quo changed in 2010.  HRSA released new guidance that purported to permit *all* covered entities—even those with their own in-house pharmacies—to contract with an *unlimited* number of contract pharmacies, rather than just one local pharmacy. 75 Fed. Reg. 10272, 10273 (Mar. 5, 2010).  Like the 1996 guidance, the 2010 guidance claimed

that it did not "impose[] additional burdens upon manufacturers" or "create[] any new rights for covered entities under the law." *Id.* at 10273.

In the decade following the 2010 guidance, contract pharmacies participating in the program exploded from about 1,300 to 23,000. *Novartis*, 102 F.4th at 457. That should surprise no one: The more contract pharmacies a covered entity uses, the higher its profits from the sale of those drugs at *full price*. *See* ROA.71 (¶5); ROA.277 (n.37); ROA.941-ROA.942 (¶¶4-5). Contract pharmacies—often multibillion-dollar, for-profit companies like CVS and Walgreens—generate significant profits by sharing in the "spread" from selling 340B-priced drugs at full or higher prices to pharmacy customers and/or seeking full commercial reimbursement from the customers' insurance plans. So important are 340B profits to these pharmacy chains that, when certain manufacturers stopped shipping them unlimited amounts of discounted drugs, CVS and Walgreens listed the revised pharmacy policies as a material risk to their business.[1]

---

[1] *See* CVS Pharmacy 10-K (2022), at 22, https://tinyurl.com/mrykrxj8 (explaining that a reduction in contract pharmacy arrangements "could materially and adversely affect the Company"); Walgreens, Inc. 10-K (2022), at 28, https://tinyurl.com/4ks6mf3s (similar).

Because contract pharmacies are not entitled to participate in the 340B Program (since they are not among the statutorily enumerated eligible entities), their relationship to covered entities is governed entirely by contract. Many of these contracts provide that the covered entities will "pay flat fees [to the contract pharmacies] for each eligible 340B prescription." ROA.1065. "[F]lat fees range[] from $0 to $1,750 per eligible 340B prescription." ROA.1066 (n.39). Some contracts also "require[] the covered entity to pay the contract pharmacy a fee based on a percentage of revenue generated for each 340B prescription." ROA.1065. In either case, contract pharmacies pocket billions of dollars each year in spread provided by manufacturers like AbbVie. ROA.80-ROA.81 (¶¶38-39).

### 2. The Replenishment Model.

Along the way, covered entities and contract pharmacies have taken steps to maximize their arbitrage profits and, concerningly, dispense drugs purchased at the 340B price to customers who are not patients of covered entities. At the beginning of the 340B Program, contract pharmacies maintained separate, segregated stocks of 340B-priced drugs over which the covered entity maintained title, and the

pharmacy dispensed to the covered entity's patients on its behalf. That is no longer true today. In most contract-pharmacy arrangements, 340B-priced drugs are mixed with the pharmacy's general inventory and title transfers to the pharmacy long before a 340B-eligible patient is identified. *See* ROA.287-ROA.288 (¶¶8-10); ROA.293-ROA.294 (¶¶8, 11); ROA.941-ROA.942 (¶¶4, 6, 8); ROA.1600-ROA.1601.

Most contract pharmacies, including in Louisiana, operate under what is known as the "replenishment model." *E.g.*, ROA.84; ROA.941-ROA.942 (¶¶3-5); ROA.1130-ROA.1133 (¶¶3-11). Under this model, the contract pharmacy fills all prescriptions using its own drug inventory (which comprises co-mingled drugs purchased at the market price and the 340B price) to all individuals at the point of sale, irrespective of whether they are a covered entity's patient. The pharmacy does not determine at the point-of-purchase whether the individual receiving the drug is eligible to receive the drug acquired at the 340B discount—nor would that matter to the patient, since it would not impact her price. Only later, on the back end, does the pharmacy (with the help of its "third-party administrator") determine through a black-box algorithm which dispenses *may* have been 340B eligible. ROA.941-ROA.942 (¶5);

ROA.1131 (¶¶4-6). Then, once sufficient identified dispenses for a particular drug accumulate under that algorithm, the covered entity orders additional quantities of that drug at the 340B price for the contract pharmacy. ROA.941-ROA.942 (¶5); ROA.1130-ROA.1133 (¶¶3-11). Typically, though, the contract pharmacy or its third-party administrator places the order using the covered entity's account, and sometimes without the knowledge of the covered entity. ROA.941-ROA.943 (¶¶5, 9-10). Once the contract pharmacy receives the replenishment order, the 340B-priced drugs are "placed on the shelf, become[] 'neutral inventory,' and may be dispensed to any subsequent patient"—340B or not. ROA.1133 (¶11). And the cycle repeats itself. At no time is the patient provided with any part of the 340B discount: neither at the point of sale nor retroactively after the 340B eligibility determination is made.

This arrangement has led to a significant uptick in abuse. The HHS Office of Inspector General has found that contract-pharmacy arrangements create a greater risk of the discounted drugs being dispensed to customers who are not covered-entity patients. HHS Office of Inspector General, OEI-05-13-00431, Mem. Report: *Contract*

*Pharmacy Arrangements in the 340B Program* (2014), at 1-2, https://tinyurl.com/y5rz5nxj. That is because, in reality, the contract pharmacies' 340B criteria used for the algorithm are often materially overinclusive, sweeping in individuals that are no longer receiving prescriptions as a patient of a covered entity. ROA.278 (¶50); ROA.941-ROA.942 (¶5). This approach enables the covered entity and its pharmacies to maximize their arbitrage profits. Indeed, "[t]he covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate" and thus each actor "has a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Novartis*, 102 F.4th at 457-58. Importantly, contract pharmacies often take title to the 340B drugs themselves, and do not maintain an agency relationship with the covered entities they "service." ROA.942-ROA.943 (¶¶8-11); *see* ROA.277-ROA.278 (¶¶46-47); ROA.83-85 (¶¶53, 56-57).

Nor has the contract pharmacy explosion resulted in increased care to the needy or lower costs for patients. Among the 340B hospitals surveyed by the U.S. Government Accountability Office, approximately half of covered entities admit that they do not pass on *any* discounts to

17

patients at contract pharmacies—and others admit they do so only rarely. *See* ROA.85-ROA.86 (¶60); ROA.1075; ROA.1070-ROA.1071; ROA.278 (¶52); ROA.975. Indeed, industry experts have observed that needy patients scarcely benefit from expansions in the 340B Program and many patients continue to see no real benefit at all. *See* ROA.278 (¶52); ROA.1119-ROA.1122; ROA.1139. Some have even suggested that charity care to the needy has not just stagnated but declined under the regime of ever-expanding commercial pharmacy participation, with a majority of 340B hospitals providing even less charity care, on average, than ordinary hospitals. ROA.86-ROA.87 (¶¶62-63).

### 3. Manufacturers' Policies and Resulting Litigation.

Beginning in 2020, drug manufacturers began to adopt contract-pharmacy policies that address these abuses. AbbVie's policy has *always* offered covered entities unlimited 340B drugs at or below the ceiling price. *See* ROA.88 (¶66); ROA.288-ROA.289 (¶13). But AbbVie will not provide discounted drugs to unlimited, third-party contract pharmacies serving covered entities. Instead, consistent with the 1996 Guidelines, AbbVie permits 340B orders from one contract pharmacy location if the hospital covered entity does not have an in-house pharmacy and it is

18

located within 40 miles of the covered entity.    If a hospital covered entity is unable to identify an eligible contract pharmacy within 40 miles, AbbVie will work with the covered entity to identify a suitable alternative, provided the entity submits limited claims data on 340B utilization for such contract pharmacy location.    In addition, federal grantee entities may use an unlimited number of contract pharmacies provided they supply certain claims data. This policy satisfies AbbVie's federal obligation to "offer" its drugs to covered entities on reasonable terms. *Novartis*, 102 F.4th at 464.

In response to manufacturers' policies, HHS issued an Advisory Opinion in December 2020 contending that the 340B statute requires manufacturers to transfer discounted drugs to an unlimited number of contract pharmacies. HHS, Off. of the Gen. Counsel, Advisory Opinion 20-06 on Contract Pharmacies under the 340B Program (Dec. 30, 2020), at 1-3, 8, https://tinyurl.com/2ca6rmnm.  That document was ultimately withdrawn after a federal district court held it unlawful. *See AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47 (D. Del. 2021).  Since then, both the Third Circuit and the D.C. Circuit have also broadly upheld

manufacturers' contract pharmacy policies as lawful and consistent with the 340B statute. *Sanofi*, 58 F.4th at 704; *Novartis*, 102 F.4th at 460.

### C.    The Louisiana Law.

In June 2023, Louisiana enacted Act 358, the "Defending Affordable Prescription Drug Costs Act." *See* Act 358 (codified at La. Stat. Ann. §§40:2881-2886). The most relevant feature of the law for this case is §40:2884(A), which states: "A manufacturer … shall not deny, restrict, prohibit, or otherwise interfere with, … *the acquisition of a 340B drug by*, or delivery of a 340B drug to, *a pharmacy* that is under contract with a 340B entity and is authorized under such contract to receive and dispense 340B drugs on behalf of the covered entity…." La. Stat. Ann. §40:2884(A) (emphasis added). The phrase "340B drug" is defined by reference to its price—*i.e.*, a unit of drug that is acquired by a covered entity at or below the federal ceiling price. *Id.* §40:2882(1). Thus, the defining feature of the statute is the *price* at which AbbVie must provide its drugs to contract pharmacies. It is undisputed that pharmacies otherwise have unlimited access to AbbVie's products at ordinary commercial prices. In short, Act 358 regulates only price, not access.

20

A violation of Act 358 constitutes a violation of the Louisiana Unfair Trade Practices and Consumer Protection Law, which carries substantial consequences. *Id.* §40:2885; *see id.* §51:1401, *et seq.* That law empowers the Attorney General and her staff to seek civil penalties and injunctive relief against alleged violators. *Id.* §§51:1407, 51:1417. Louisiana courts can also inflict additional penalties, including but not limited to termination of the right to do business in the state. *Id.* §51:1408.

### D.    This Litigation.

AbbVie filed this suit to challenge the constitutionality of Act 358. First, AbbVie alleged that Act 358 is preempted because it expands manufacturers' obligations under the federal 340B Program and brings its own enforcement scheme to bear. Second, AbbVie alleged that Act 358 effectuates an unconstitutional taking because it compels AbbVie to transfer its drugs at significant discounts to private, for-profit pharmacies, rather than for a "public use."

After AbbVie moved for summary judgment, and before the Attorney General responded, Louisiana Primary Care Association—a nonprofit whose member organizations include covered entities—moved to intervene as a defendant. In a conclusory order without meaningful

analysis or explanation, the district court granted that motion. *See* ROA.697.

After a hearing on summary judgment, the district court denied AbbVie's motion and granted summary judgment to the State (as well as the intervenor) in a written order. In rejecting AbbVie's preemption claims, the court focused on Section 340B's lack of affirmative contract-pharmacy obligations. *E.g.*, ROA.1503-ROA.1504, ROA.1509. In its view, Congress left open the door for states to add their own contract-pharmacy requirements—and, the court added, such state-law measures "arguably advance[]" Section 340B's objectives by "increas[ing] the[] revenues" available to covered entities under the Program. ROA.1512. Then, in rejecting AbbVie's takings argument, the court reasoned that AbbVie's ostensibly voluntary participation in the federal 340B Program somehow "foreclosed the possibility" that Louisiana's additional state-law requirements "could result in an imposed taking of private property." ROA.1523. It also deemed Act 358 too foreseeable—and insufficiently onerous—to qualify as a regulatory taking. ROA.1523-ROA.1524.

This appeal followed.

## SUMMARY OF THE ARGUMENT

The district court erroneously awarded summary judgment to the Attorney General, and this Court should reverse. AbbVie is entitled to relief because Louisiana's law violates the Constitution in two different ways.

***First***, Act 358 offends the Supremacy Clause because it thrusts Louisiana into the middle of a complex federal healthcare regime and meddles with the substantive rules and enforcement mechanisms that Congress created to govern it. That cannot stand because Congress impliedly preempted the entire field of 340B pricing and eligibility, and Act 358 improperly conflicts with Congress's purposes. Indeed, a federal court has already preliminarily enjoined a similar state law on preemption grounds. *PhRMA v. Morrisey*, 2024 WL 5147643, at *7-12 (S.D. W. Va. Dec. 17, 2024).

***Second***, the law effects a physical taking because it coerces AbbVie to transfer its drugs to for-profit commercial pharmacies, against its will, and for no public use. Supreme Court precedent has always held that this kind of private, A-to-B transfer runs afoul of the Fifth Amendment's Takings Clause. *See Calder v. Bull*, 3 U.S. 386, 388 (1798) (Chase, J.).

Supreme Court precedent and the original understanding of the Fifth Amendment forbid ascribing to Act 358 any justifying "public use." During both the Founding and Reconstruction, the "public use" requirement limited takings to instances where either the government seized property for itself or transferred it to a private owner obligated to provide the public a right of access as a common carrier. The narrow modern exceptions to that rule do not extend to forcing A to transfer its property to B for B's own benefit, rather than to abate a public harm.

*Finally*, Louisiana Primary Care Association should not be permitted to intervene in this matter because it has no interest in the outcome of this litigation and, even if it did, the Attorney General adequately represents that interest.

## STANDARD OF REVIEW

This Court reviews grants of summary judgment de novo. *Catalyst Strategic Advisors, L.L.C. v. Three Diamond Cap. Sbc, L.L.C.*, 93 F.4th 870, 874 (5th Cir. 2024). Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)).

24

This Court reviews de novo an order on a motion to intervene—except for the element of timeliness which is reviewed for an abuse of discretion. *Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 167 (5th Cir. 1993). To intervene as of right, a party must satisfy four conditions: (1) the application must be timely; (2) the applicant must have an interest relating to the property or transaction that is the subject of the action; (3) the disposition of the action must threaten to impair or impede the applicant's ability to protect its interest; and (4) the applicant's interest must be inadequately represented by the existing parties. *Baker v. Wade*, 743 F.2d 236, 240 (5th Cir. 1984); Fed. R. Civ. P. 24.

An order on a motion for permissive intervention is also reviewed for an abuse of discretion. *Bush v. Viterna*, 740 F.2d 350, 359 (5th Cir. 1984). A court considering a request for permissive intervention will determine "whether the intervenors' interests are adequately represented by other parties" and "whether they 'will significantly contribute to full development of the underlying factual issues in the suit.'" *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 472 (5th Cir. 1984) (citation omitted).

## ARGUMENT

## I.   ACT 358 IS PREEMPTED BY FEDERAL LAW.

Under the Constitution's Supremacy Clause, federal law is "the supreme law of the Land." U.S. Const. art. VI. And because federal law is supreme, Congress must be left to exercise its constitutional power unencumbered by the states. *McCulloch v. Maryland*, 17 U.S. 316, 436 (1819). As Chief Justice Marshall explained, "the states have no power, by taxation or otherwise" to "impede" or "in any manner control" the "operations of the constitutional laws enacted by Congress." *Id.* Federal law preempts state laws that obstruct its purposes. *See, e.g.*, *Aldridge v. Miss. Dep't of Corr.*, 990 F.3d 868, 874 (5th Cir. 2021).

### A.   The 340B Program Preempts the Field.

"States are precluded from regulating conduct in a field that Congress … has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Intent to displace state law in a field can be inferred from a "framework of regulation so pervasive" that "Congress left no room for the States to supplement it," or a "federal interest" so "dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* (citation omitted).

### 1.    Congress Created a Wholly Federal System.

Section 340B creates a comprehensive federal drug-pricing scheme for certain types of entities that is an exclusive and closed-system.  And that scheme is integrated within the federal government's broader healthcare framework.  340B discounts do not exist in nature.  Rather, they are entirely a product of, and remain controlled by, federal law.

At its most basic level, Section 340B obligates manufacturers to offer certain of their drugs to certain covered entities at the statute's ceiling price.  42 U.S.C. §256b(a)(1).  Congress and HHS have implemented that obligation through a detailed set of statutory provisions, rules, and guidance documents.  Together, those rules incentivize manufacturers' participation in the Program without becoming so extortive that manufacturers are motivated to withdraw from both 340B and Medicaid.

Among the 340B Program's many substantive rules are the drugs that are covered by the Program, 42 U.S.C. §256b(b)(2), the prices that manufacturers must charge, *id.* §256b(a)(1), (a)(2), the specific types of covered entities to whom manufacturers must offer the discounted drugs, *id.* §256b(a)(4)(A)-(O), and the legal requirements that attach to covered

27

entities, including prohibitions against duplicate discounting and diversion, and the obligation to permit audits, *id.* §256b(a)(5)(A)-(C). Thus, while obligating manufacturers to provide specific drugs at specific prices to specific covered entities, the Program also strictly proscribes potential statutory violations by manufacturers. That itself reflects the balance Congress struck in enacting the 340B Program.

Congress and HHS also have created a comprehensive and exclusive remedial scheme for alleged 340B violations. Congress granted HHS exclusive authority to monitor compliance with the Program and provided it with compliance mechanisms such as civil monetary penalties and expulsion from the Program. *See id.* §256b(d). Congress also instructed HHS to create an administrative dispute resolution process for disputes between covered entities and manufacturers regarding diversion, duplicate discounting, and overcharges. *Id.* §256b(d)(3). HHS followed those instructions in April 2024 and provided for a complete dispute resolution process that is now live and accepting claims. 89 Fed. Reg. 28643 (Apr. 19, 2024). That process covers pricing disputes between covered entities and manufacturers. 42 C.F.R. §10.21(a)(1).

Perhaps most importantly, the federal rights and obligations that 340B creates are exclusive to the 340B Program, and they constitute just one part of an integrated whole. In other words, the 340B Program is one aspect of the federal government's healthcare regime, with each program—including 340B and Medicaid—intertwined with the other. That not only explains why participation in 340B is a precondition of participation in federal Medicaid; it also makes sense of the Supreme Court's observation that the 340B and Medicaid Drug Rebate Programs are "interdependent." *Astra*, 563 U.S. at 114, 120. This "interdependent nature of the two programs' requirements means that an adjudication of rights under one program must proceed with an eye towards any implications for the other." *Id.* at 120. That is why the Court concluded that private suits by 340B covered entities to enforce the Program's requirements would "undermine the agency's efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Id.*

Although the *Astra* case did not involve a preemption claim, the Court's descriptions of the 340B Program demonstrates how and why Congress preempted the field. "Congress vested authority to oversee

compliance with the 340B Program in HHS and assigned no auxiliary enforcement role to covered entities." *Id.* at 117. More specifically, "Congress placed the Secretary [of HHS] (acting through her designate, HRSA) in control of §340B's drug-price prescriptions," and "[t]hat control could not be maintained were potentially thousands of covered entities permitted to bring suits alleging errors in manufacturers' price calculations." *Id.* at 114. Such an auxiliary enforcement mechanism "could spawn a multitude of dispersed and uncoordinated lawsuits" with "HHS unable to hold the control rein," and the resulting "risk of conflicting adjudications would be substantial." *Id.* at 120. Thus, "spreading the enforcement burden" to other entities is "hardly what Congress contemplated when it 'centralized enforcement [of the 340B Program] in the [federal] government.'" *Id.* at 119-20.

The exact same is true of an ad hoc and un-coordinated effort spread out across a variety of states. At bottom, because Section 340B "provide[s] the exclusive cause of action for [overcharge] claims, there is, in short, no such thing as a state-law claim [for overcharging] against a [manufacturer of 340B drugs]." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 11 (2003).

### 2. Louisiana May Not Tinker with Congress's Policy Decisions in Section 340B.

Louisiana disagrees with the balance Congress struck in the 340B statute and seeks to append its own substantive requirements onto the federal Program.  It cannot.  "[T]he states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government."  *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 802 (1995).  Here, Louisiana has invaded the field of 340B pricing and eligibility by enacting its own statute that effectively expands the list of entities eligible for 340B pricing and enhancing the penalty regime for violations of its new substantive obligations.

That is literally the oldest preemption problem in the book.  Like the Maryland law struck down in *McCulloch* attempting to tax *only* the Bank of the United States, 17 U.S. at 435-36, Act 358 applies *only* to 340B drugs.  It regulates nothing *except* transactions undertaken pursuant to a federal program, governed by federal contracts between drug manufacturers and the United States.  Louisiana has no authority to directly regulate what Congress has made.  *See Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 288-89 (1986).  Louisiana's law literally could not exist without the federal 340B Program.

31

The Supreme Court's decision in *Arizona* is instructive. There, the Court found preempted an Arizona state law that made it a misdemeanor to willfully fail to "complete or carry an alien registration document" in violation of federal law. 567 U.S. at 400. In that way, the state added a "state-law penalty for conduct proscribed by federal law." *Id.* In finding the state provision preempted, the Court explained that "federal statutory directives provide a full set of standards governing alien registration, including punishments for noncompliance," which Congress designed to be a "harmonious whole." *Id.* at 401. The Court continued: "Where Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Id.*

The same logic applies to this case, except that Louisiana has *expanded* obligations under a federal program and added a state-law penalty for violations. The Supreme Court has explained that Congress intended the 340B Program to be a harmonious whole, enforced only by HHS. *Astra*, 563 U.S. at 120. In short, Congress has occupied the field

of 340B pricing and eligibility such that even purported complementary state regulation is impermissible.

In reaching the opposite conclusion, the district court relied on a court of appeals decision that upheld the very contract pharmacy policies that Louisiana now seeks to proscribe, largely on the basis that the 340B statute imposes no affirmative obligations on manufacturers concerning contract pharmacies. True, both the D.C. and Third Circuits have concluded the 340B Program does not require anything of manufacturers as it relates to contract pharmacies. *See Sanofi*, 58 F.4th at 704; *Novartis*, 102 F.4th at 464. But Congress's decision not to impose a particular obligation on manufacturers within the wider 340B regime *does not mean that the decision was left to the states*. Section 340B prescribes a condition of federal participation, so what *is* required is just as important as what is *not* required. *Novartis*, 102 F.4th at 460 ("We think that this silence preserves—rather than abrogates—the ability of sellers to impose at least some delivery conditions."). That is particularly true where, as here, the obligation intended to be granted onto the federal program would increase the costs of participation, threatening the balance struck by Congress. Congress's work in the 340B statute reflects

a variety of competing policy judgments that typically accompany lawmaking in a complex industry. And because Congress's work is detailed and pervasive, the best inference is that it intended to preempt the field of 340B pricing and eligibility.

Moreover, the district court misreads *Sanofi* to be fundamentally about HHS's "statutory authority" under Section 340B to make decisions about contract pharmacies. ROA.1507. That is only half the story—and not the relevant part for purposes of this case. *Sanofi* (and later *Novartis*) expressly decided whether "Section 340B requires drug makers to deliver drugs to an unlimited number of contract pharmacies." 58 F.4th at 703. Put differently, the cases dealt with the authority and autonomy 340B grants to drug manufacturers with respect to contract pharmacies. *Sanofi* did not involve HHS's rulemaking authority, *id.* (noting "the parties agree" that "HHS lacks rulemaking authority here"), and the Third Circuit interpreted the scope of Section 340B without deference to HHS's position. Ultimately, both *Sanofi* and *Novartis* held that because the 340B statute is "silent" on whether drug manufacturers must provide drugs to contract pharmacies, it preserves manufacturers' liberty to

impose reasonable restrictions in the area, including by restricting or denying provision of drugs to contract pharmacies.

The district court also incorrectly concluded that the 340B statute does not extend to the "relationship between covered entities and their contract pharmacies," and that Act 358 simply fills this statutory silence. ROA.1503-ROA.1504. The court reasoned that "Section 340B does not prevent covered entities from entering into contracts with independent pharmacies." ROA.1504. While that is true enough, it misses the point. Section 340B does not prohibit contract pharmacies, but as clearly articulated in *Sanofi* and *Novartis*, manufacturers are entitled to impose "at least some delivery conditions"—including reasonable restrictions on transfer of drugs to contract pharmacies. *Novartis*, 102 F.4th at 460; *Sanofi*, 58 F.4th at 704. And to suggest, as the district court did, that Act 358 does not address "pricing" is plainly wrong. ROA.1509. The Act explicitly regulates AbbVie's drugs by reference to their discounted price. *See* La. Stat. Ann. §40:2882(2); *see also Morrisey*, 2024 WL 5147643, at *8 (concluding that similar state law "regulates price, not delivery" and finding that "[t]he question is only about what price the pharmacy and the covered entity will pay the manufacturer for the replenished drug

upon distribution of the 340B Program eligible one"). Accordingly, Act 358 unconstitutionally intrudes on the federal field of 340B pricing and eligibility.

### B.    Act 358 Conflicts with the 340B Program.

Act 358 is conflict preempted because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in creating the 340B Program. *Arizona*, 567 U.S. at 399. In particular, Act 358 conflicts with federal law by compelling AbbVie to provide its drugs at the ceiling price to entities not enumerated in the statute and subjecting it to a parallel state enforcement scheme.

### 1.    Act 358 Improperly Expands 340B Obligations Under the 340B Program.

Act 358 conflicts with Section 340B because it expands manufacturers' obligations under the federal Program by compelling them to transfer their drugs at discounted prices to contract pharmacies. Put concretely, the law "enacts a state [obligation] where no federal counterpart exists." *Id.* at 403. And that imposition "upsets the balance struck" in the 340B Program, thereby creating an "obstacle to the federal plan of regulation and control." *Id.*

In its preemption analysis, the district court placed significant weight on its observation that "Section 340B does [not] address contract pharmacies."[2]  ROA.1512.  But that statutory omission was not a "gap" left for states to fill on their own.  It was an intentional policy choice that reflected Congress's considered judgment.

Several textual cues bear that out.  First, Section 340B specifically enumerates the entities entitled to 340B pricing but does not include contract pharmacies.  "It is hard to believe that Congress enumerated 15 types of covered entities with a high degree of precision and intended to include contract pharmacies as a 16th option by implication." *AstraZeneca*, 543 F. Supp. 3d at 60.  Second, a statutory neighbor of 340B regulating the prices that federal agencies pay for drugs (a close analogue to 340B itself) explicitly contemplates that manufacturers will distribute drugs through contract pharmacies.  *See Sanofi*, 58 F.4th at 704-05. Congress did not include any such language in the 340B statute, a choice presumed to be intentional.  *Id.*  Indeed, when enacting 340B, Congress *rejected* a bill that would have required that 340B discounts be

---

[2]  The district court omitted the word "not," but AbbVie assumes—given the context—that this omission was a typographical error.

distributed "under a contract entered into for on-site pharmacy services." S. Rep. No. 102-259, at 2 (1992). Congress made the deliberate decision to omit that language, reasonably reflecting Congress's "considered judgment" that such an obligation "would be inconsistent with federal policy and objectives." *Arizona*, 567 U.S. at 405.

Louisiana now contradicts that choice by imposing its own contract-pharmacy requirement, thereby expanding the obligations of manufacturers participating in the 340B Program. That is a conflict. When Congress has crafted a comprehensive framework, as it has done in Section 340B, the items that Congress *does not* include reflect its considered judgment in the same way as the items that it does include. *See Arizona*, 567 U.S. at 404-06; *see also Rapanos v. United States*, 547 U.S. 715, 752 (2006). The 340B Program's scope reflects a careful balance between competing interests: Congress wanted to create drug discounts, but it also needed to incentivize drug manufacturers to participate. By ignoring Section 340B's *limits* on obligations assumed by participating manufacturers, Louisiana "skew[s]" the finely wrought balance that Congress struck. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001).

**2.    Act 358 Thwarts Congress's Intent to Vest Exclusive Authority for Enforcing Section 340B in the Federal Government.**

Act 358 also clashes with Congress's enforcement scheme by empowering the Louisiana Attorney General to impose various state sanctions on manufacturers that fail to provide 340B-priced drugs to contract pharmacies. Louisiana's enforcement regime will "inevitably conflict" with the federal government's ability to police 340B compliance "consistently with [its] judgment and objectives." *Id.* at 350. That is why a federal court in West Virginia recently preliminarily enjoined a substantially similar state law. *Morrisey*, 2024 WL 5147643, at *7-12 (holding that law was likely preempted because it threatened the federal government's enforcement authority and hampered manufacturers' access to the federal enforcement scheme).

Section 340B's compliance scheme reflects several of Congress's considered judgments. Congress made the federal government the sole and exclusive enforcement arm of the 340B Program, with review by the federal courts. *See Astra*, 563 U.S. at 120. In addition, Congress specifically delineated which tools the agency could use to ensure that

participating manufacturers comply with the Program's requirements. 42 U.S.C. §256b(d)(l)(B)(v), (d)(3).

Louisiana undermines those judgments by authorizing its own officers to police manufacturers' participation in the 340B Program. *See Morrisey*, 2024 WL 5147643, at *12 (holding it "should be apparent" that enforcement of state statute "cut[s] against the Supreme Court's holding in *Astra*"). So, if AbbVie refuses to provide 340B pricing on drugs that it delivers to contract pharmacies, it will face state sanctions (that Congress did not want) in a state-court tribunal (that Congress did not empower). "'Conflict is imminent' when 'two separate remedies are brought to bear on the same activity.'" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000) (citation omitted).

That conflict is particularly acute here because Louisiana decisionmakers will need to resolve questions of federal law in determining whether a manufacturer violated Act 358. Louisiana's law prohibits a manufacturer from limiting the acquisition of "a 340B drug" by a contract pharmacy authorized by "a covered entity" to receive it. La. Stat. Ann. §40:2884(A). Louisiana, in enforcing the law, would thus need to decide—among other things—whether the denied prescriptions were

actually eligible for 340B pricing and whether the covered entity has engaged in prohibited diversion or duplicate discounting. The result is a hodgepodge of state and federal adjudicators deciding the same purely federal questions in potentially inconsistent ways. "This risk of conflicting results cuts against Congress's vision of 'centralized enforcement' that *Astra* found as necessary to execute the 340B Program." *Morrisey*, 2024 WL 5147643, at *11.

### 3. The District Court Was Wrong to Conclude That Act 358 Is Not Preempted Because It Furthers the 340B Program.

Both the district court and the State appear to believe that because Act 358 purports to aim toward the same substantive ends as 340B, it cannot be inconsistent with the federal regime. But the Supreme Court squarely rejected that logic in *Arizona*: "Although [Act 358] attempts to achieve ... the same goals as federal law … it involves a conflict in the method of enforcement. The Court has recognized that a 'conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy.'" *Arizona*, 567 U.S. at 406; *see also Novartis Pharms. Corp. v. Espinosa*, 2021 WL 5161783, at *7 (D.D.C. Nov. 5, 2021). And here, Congress's "purpose" includes the limits to its

41

Program's scope and its built-in protections for participating manufacturers. *See Rapanos*, 547 U.S. at 752; *Morrisey*, 2024 WL 5147643, at *6. So, the district court's observation that Act 358 "increase[s] the[] revenues" that covered entities collect from the 340B Program (at the expense of manufacturers and paid for by customers or their insurers at the full retail price) does not show that Louisiana's law "advances" 340B's objectives. *See* ROA.1512. That is because "no legislation pursues its purposes at all costs" and "[d]eciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice"—not the courts. *Rodriguez v. United States*, 480 U.S. 522, 526 (1987). And "it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Id.*

Further, both the district court and the Attorney General rely on the Eighth Circuit's decision in *PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024)—which upheld a similar state law in Arkansas. But that decision, and the district court's decision applying it here, rest on mistaken premises. The most significant is that laws like Act 358

42

regulate "delivery" or the practice of pharmacy, areas traditionally left to state regulation.

Act 358 does not regulate traditional state areas but instead regulates drug *pricing* and *eligibility* under a purely *federal* regime. The law instructs that manufacturers may not prohibit the "acquisition" of *discounted* drugs *by* commercial pharmacies. La. Stat. Ann. §40:2884(A). And by its terms, it applies only to drugs "subject to any offer for reduced prices … pursuant to [Section 340B]." *Id.* §40:2882(1), (2).

A hypothetical illustrates the point made by the statutory text. A manufacturer would face penalties under the Louisiana law if it offered unlimited quantities of its drugs for purchase to contract pharmacies, delivered direct to the pharmacy, but requested payment *above* the 340B ceiling price. Yet a manufacturer would not face such liability if its offer included pricing at or below the ceiling price. In other words, the statute regulates *pricing* and *eligibility*, not methods of distribution. As another court put it: "[U]nder the replenishment model the pharmacy will be delivered the drug regardless of its price. Only if the 340B drug—that is, if the 340B *price*—is refused does the contract pharmacy have its 'acquisition' of the drug restricted. *Morrisey*, 2024 WL 5147643, at *10.

43

Imagine, by contrast, a state law requiring delivery of drugs by temperature-controlled trucks, or a law that required all drugs be shipped in red boxes for ease of demarcation. *Those* would be traditional delivery regulations. Act 358 is not. Act 358 has everything to do with *whether* AbbVie will provide its drugs at 340B prices and *to whom*, but nothing to do with *how*. And precisely because Act 358 is not a "health and safety" regulation under the State's traditional police powers, the "presumption against preemption" is inapplicable. Indeed, by regulating manufacturers' obligations to transfer and sell their drugs at discounted federal prices under the 340B statute, Act 358 is interfering with a relationship that is "inherently federal in character." *Buckman*, 531 U.S. at 347.

Two other misunderstandings underlay *McClain*'s preemption analysis.

***First***, central to the reasoning in *McClain* is the notion that covered entities retain title to the purchased discounted drugs. 95 F.4th at 1142. That is not the case. *See, e.g.*, ROA.941-ROA.942 (¶¶3-8); ROA.1133 (¶11). Once the pharmacy receives a 340B-priced drug, that drug is placed on the shelf where it becomes "neutral inventory." ROA.1131,

ROA.1133 (¶¶4, 11). In other words, covered entities do not retain title: at the time of sale to a patient, a particular unit of drug is owned by the pharmacy itself. ROA.942 (¶¶6, 8). Pharmacies admit they do not maintain physically segregated inventories for 340B and non-340B drugs. ROA.941-ROA.942 (¶¶4, 8).

**Second**, *McClain* appeared to believe that contract pharmacies maintain an agency relationship with the covered entities they "serve." That conclusion is likewise mistaken. ROA.943-ROA.944 (¶¶11, 13). Agency relationships require the principal to have "the right of control over the conduct and activities of the purported agent." *Wood v. Holiday Inns, Inc.*, 508 F.2d 167, 172 (5th Cir. 1975). But covered entities rarely exercise that level of control over pharmacies, if at all. Rather, contract pharmacies often order 340B drugs from manufacturers themselves, using the covered entities' purchasing accounts, and sometimes even without the covered entities' knowledge. ROA.943 (¶9). And while *McClain* looked to HRSA's 1996 and 2010 guidance in stating its *aspiration* that an agency relationship be maintained, *see* 95 F.4th at 1142 (citing 61 Fed. Reg. 43552), HRSA's stated ambition from over a

45

decade ago has little to do with the practice on the ground today. Accordingly, the district court's reliance on *McClain* was misplaced.

## II.  ACT 358 EFFECTUATES AN UNCONSTITUTIONAL TAKING.

Act 358 effectuates an unconstitutional physical taking because it compels the transfer of AbbVie's property to private parties that will sell the drugs at regular prices and retain the profit for themselves.  Such takings have *never* been allowed under the Fifth Amendment, which permits the taking of private property only for "public use."  U.S. Const. amend. V; *see also Calder*, 3 U.S. at 388.  Nor could any compensation conceivably cure Act 358's compelled transfer because it does not put the property to any "public use."

This Court, guided by the Supreme Court, has articulated several principles that inform its Takings Clause jurisprudence.  ***First***, "history and tradition, including historical precedents, are of central importance when determining the meaning of the Takings Clause."  *Baker v. City of McKinney, Tex.*, 84 F.4th 378, 383 (5th Cir. 2023).  Judicial precedents stretching from the first Justices of the Supreme Court to the modern day have recognized the Takings Clause cannot justify a taking from one

private party to another. *See, e.g.*, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005); *Calder*, 3 U.S. at 388.

***Second***, "takings cases 'should be assessed with reference to the "particular circumstances of each case," not by resorting to blanket exclusionary rules.'" *Baker*, 84 F.4th at 383 (citation omitted).   For example, this Court has clarified that vague gestures toward the State's "police power" are insufficient to justify a taking because "if the uses of private property were subject to unbridled, uncompensated qualification under the police power, the natural tendency of human nature would be to extend the qualification more and more until at last private property disappeared." *Id.* (internal quotations and citation omitted).

Together, these principles reflect a broader recognition that "[t]he Fifth Amendment ... was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Baker v. City of McKinney, Tex.*, 93 F.4th 251, 251 (5th Cir. 2024) (Elrod, J., dissenting from the denial of rehearing en banc) (citation omitted).   Indeed, the "Founders recognized that the protection of private property is indispensable to the promotion of individual freedom.  As John Adams tersely put it, 'property

47

must be secured, or liberty cannot exist.'" *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021) (citation omitted).

## A.    Act 358 Effectuates a Physical Taking.

Act 358 works a physical taking.  When the government acquires property for a third party, it is a "physical appropriation[]" that "constitute[s] the 'clearest sort of taking.'" *Id.* at 148.  And "[g]overnment action that physically appropriates property is no less a physical taking because it arises from a regulation." *Id.* at 149.  The "essential question" when deciding whether a taking is physical or "regulatory" is "whether the government has physically taken property for itself or someone else— by whatever means—or has instead restricted a property owner's ability to use his own property." *Id.*  Whenever a law "results in a physical appropriation of property, a *per se* taking has occurred." *Id.*  Act 358 achieves this sort of physical taking by compelling a transfer of AbbVie's property to private parties.

Act 358's text confirms it compels the transfer of property at a particular price—rather than, as the Attorney General suggests, regulating only the method of delivery for drugs that AbbVie already agreed to provide.  The Act insists that "[a] manufacturer or distributor

shall not deny, restrict, prohibit, or otherwise interfere with" the "*acquisition of a 340B drug* by … a pharmacy that is under contract with a 340B entity…." La. Stat. Ann. §40:2884(A) (emphasis added). The ordinary meaning of "acquisition" is the "gaining of possession or control over something." Black's Law Dictionary (12th ed. 2024); *Acquire*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/acquire (last visited Jan. 8, 2025) (defining "acquire" as "to come into possession or control of often by unspecified means"). So Act 358, in plain English, prohibits AbbVie from preventing commercial pharmacies from taking possession of AbbVie's drugs at legislatively set prices. That is a taking. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 362 (2015) (explaining that the "actual taking of possession and control" is "a taking as clearly 'as if the [receiving party] held full title and ownership'" (citation omitted)); ROA.287-ROA.288 (¶8); ROA.941-ROA.944 (¶¶4-8, 13). As the Supreme Court recently made clear, just as the "government commits a physical taking when it uses its power of eminent domain to formally condemn property," "[t]he same is true when the government physically takes possession of property without acquiring title to it." *Cedar Point*, 594 U.S. at 147; *see also Horne*, 576

U.S. at 358 (the same takings analysis applies to laws that target personal rather than real property).

The statute's title similarly confirms Act 358 compels drug transfers at a particular price. The Louisiana legislature titled Act 358 the "Defending Affordable Prescription Drug Costs Act." The title of a bill is a "permissible indicator[] of meaning" in law generally, Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (2012), §35, and in Louisiana specifically, *Dufrene v. Video Co-Op, Louisiana Workers' Comp. Corp.*, 843 So. 2d 1066, 1073 (La. 2003). Act 358's title does not reference contract arrangements or delivery-related issues such as dangerous shipping conditions. Rather, it makes clear that the law seeks to secure AbbVie's property at a particular (confiscatory) *acquisition price* for contract pharmacies.

Practice on the ground, too, confirms that the thrust of Act 358 is requiring a transfer of AbbVie's drugs to private entities at a particular price. If Act 358 stands, contract pharmacies and their third-party administrators will place orders for discounted drugs and AbbVie will have no choice but to accept and honor those orders. ROA.943 (¶¶9, 10). The pharmacies will then take title to the drugs, merge them with their

general inventory, and dispense them to customers irrespective of whether they are a covered entity's patient. ROA.941-ROA.944 (¶¶ 4-8, 11, 13). That will increase the volume of drugs manufacturers must essentially give away at significantly reduced prices so that covered entities and contract pharmacies can resell them at retail prices and generate revenue from customers and their insurers. ROA.941 (¶4). At bottom, Act 358 requires AbbVie to physically part with its personal property at a legislatively determined price, at the expense of commercial pharmacies.

## B.    Act 358's Taking Is Not for "Public Use."

Because Act 358 compels a taking that is not for "public use," it cannot pass constitutional muster. The Fifth Amendment's text limits the State's power to take property not by reference to "public purpose" or "public necessity," but instead "public use." And that phrase provides enforceable limitations on the State's power to seize private property. Under both the original understanding of the phrase and the modern doctrine, Act 358 falls short of a "public use."

1. Act 358 serves no "public use." The original meaning of that phrase limits takings to transfers to the government, or to a private

entity that had a legal obligation to hold open the property to the public. *See* Ilya Somin, *The Grasping Hand* (2015) at 36; *see also* Eric R. Claeys, *Public-Use Limitations and Natural Property Rights*, 2004 Mich. St. L. Rev. 877, 879 (2004) ("[W]hen the government assigns property to private owners not subject to a duty of public access and common-carrier regulation, it unconstitutionally takes private property for private uses."). Both during the Founding and at Reconstruction, this meant that States employed eminent domain only "to provide quintessentially public goods, such as public roads, toll roads, ferries, canals, railroads, and public parks." *Kelo v. City of New London, Conn.*, 545 U.S. 469, 512 (2005) (Thomas, J., dissenting).

At the Founding, property was a natural right and its protection was a paramount purpose of government. James Madison, the author of the Bill of Rights, described: "Government is instituted to protect property of every sort … that alone is a *just* government, which *impartially* secures to every man, whatever is his *own*." James Madison, "Property" (1792), in Philip Kurland and Ralph Lerner, eds., The Founders Constitution, (Chicago: University of Chicago Press, 1987), 1:598 (emphasis added). Two of the few judicial decisions on eminent

domain from that time reflect this principle and its application to the takings context.    First, in *Vanhorne's Lessee v. Dorrance*, Justice Paterson described (while riding circuit) that the legislature could never "by a private act, affecting particular persons only, [] take land from one citizen, who acquired it legally, and vest it in another[.]"  2 U.S. 304, 312 (C.C.D. Pa. 1795).  Second, in *Calder*, Justice Samuel Chase explained: "[A] law that takes property from A. and gives it to B." is "against all reason and justice, for a people to entrust a Legislature with SUCH powers; and, therefore, it cannot be presumed that they have done it." 3 U.S. at 388; *see also* John Locke, *Two Treatises of Government and A Letter Concerning Toleration,* ed. Ian Shapiro (Yale University Press, 2003), §138 (describing that property was a natural right and that the government could not "take from any Man part of his Property without his own consent"); William Blackstone*, Commentaries on the Laws of England* (Chicago: University of Chicago Press, 1979 [1765]), 1:135 (observing that the law does not permit invasions of private property "even for the general good of the whole community").

2.  The same was true at the Fourteenth Amendment's adoption. The majority of state court decisions from that time period reflect a view

of "public use" consistent with that described above.  *Supra* Somin at 44;
*see, e.g.*, *Bankhead v. Brown*, 25 Iowa 540, 545 (1868) (explaining the
Takings Clause prohibits "the taking of private property for any private
use whatever, without the consent of the owner … [i]t forbids private
property from being compulsorily taken for any but *public* use");
*Memphis Freight Co. v. City of Memphis*, 44 Tenn. 419, 425 (1867).

Further, as with the Founding, influential legal scholars during
Reconstruction described that takings could be justified only for a public
*use*, not a public *purpose* or *benefit*.  Thomas Cooley explained: "public
use implies a possession, occupation, and enjoyment of the land by the
public, or public agencies; and there could be no protection whatever to
private property, if the right of the government to seize and appropriate
it could exist for any other use."  Thomas Cooley, *A Treatise on the
Constitutional Limitations Which Rest Upon the Legislative Power of the
States of the American Union* at 531 (Boston: Little, Brown, 1868).  Cooley
also warned of a broader interpretation of "public use," explaining that
"there are many ways in which the property of individual owners can be
better employed or occupied when the general public is considered than
it actually is by the owners themselves."  *Id.* at 532.

3.    Louisiana's compelled transfer of AbbVie's products to pharmacies cannot be a "public use."  Louisiana does not obtain the drugs for itself and pay for them.  Instead, the private *pharmacies*, without paying market value, will gain possession and control of the drugs until dispensed to customers (at full price).  The Supreme Court has consistently condemned the kind of private A-to-B property transfer Louisiana attempts to work here.  *See, e.g.*, *Calder*, 3 U.S. at 388; *Kelo*, 545 U.S. at 477.

Indeed, Act 358 represents an extension beyond even the Court's most expansive articulation of "public use" in *Kelo*.  Louisiana's law compelling AbbVie to provide discounted drugs to for-profit pharmacies does not seek to rectify or redress any kind of "blight."  Rather, Act 358 aims at what *Kelo* expressly forbade: "a one-to-one transfer of property, executed outside the confines of an integrated development plan" which would surely constitute an "unusual exercise of government power" and "would certainly raise a suspicion that a private purpose was afoot."  545 U.S. at 487.

Compounding this constitutional error is that Act 358 improperly singles out for preferential treatment a preferred class of private entities

the State of Louisiana favors more than pharmaceutical manufacturers: commercial pharmacies. That runs afoul of existing "public use" jurisprudence even in cases where the Court ultimately sanctioned a taking. *See Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229 (1984). There is no reason to extend the urban renewal line of cases that reached their zenith in *Kelo*—and which are themselves on suspect constitutional ground, *see Kelo*, 545 U.S. at 515-21 (Thomas, J., dissenting)—to the entirely new factual and legal context presented here.

4. Even under the mistaken rubric of "public purpose," the State's claims about Act 358's public benefits are wrong. Discounted drugs are commonly sold to 340B patients and non-patients alike, irrespective of their financial status. ROA.1131 (¶5); ROA.941-ROA.942 (¶¶4, 5). The pharmacies sell the drugs at full price to someone and then retain the arbitrage profit *for themselves*, not the public. And they rarely (if ever) pass any financial benefit on to needy patients, either in the form of lower-priced drugs, other programs, or uncompensated care. In short, the profits and revenues of contract pharmacies and covered entities continue to balloon, at the expense of manufacturers and patients alike. ROA.80, ROA.80-ROA.87 (¶¶39, 57, 58, 60, 61, 63); ROA.276-ROA.278

(¶¶42, 44, 47, 52).  None of that is what the Constitution means by "public use."

### C.    Act 358's Taking Is Coercive, Not Voluntary.

The State's primary takings defense below centered on the so-called "voluntary participation" doctrine, but that doctrine cannot save Act 358 for two separate, independent reasons.

***First***, Louisiana does not condition compliance with Act 358 on anything the State itself offers.  It simply demands manufacturers sell the products at the federally discounted price to commercial pharmacies, on pain of civil penalties.  There is no benefit of Louisiana's that manufacturers can refuse to avoid the penalties that Act 358 carries.  And AbbVie's ostensibly voluntary participation in the *federal* 340B Program, as well as Medicaid, does not mean that it has voluntarily chosen to participate in *Louisiana's* compulsory regime.

The one court that has confronted an issue like this agreed with AbbVie's position.  *See Virginia Hosp. & Healthcare Ass'n v. Roberts*, 671 F. Supp. 3d 633 (E.D. Va. 2023).  There, Virginia law required hospitals participating in federal Medicare or Medicaid to obtain a certificate of public need if they wanted to make certain updates to their facilities in

excess of a specified dollar amount. *Id.* at 644. Hospitals sued both the federal and state governments under the Takings Clause. The court determined that the *federal* government had no takings liability, because the hospitals voluntarily participated in the *federal* Medicaid and Medicare programs. But, as against the *state* government, the court concluded that Virginia compelled "any healthcare system with an acute care hospital in Virginia to participate in Medicare and Medicaid," in violation of the Takings Clause, because "[t]hose *state law* [certificate] requirements have no bearing on whether provider's participation in Medicaid and Medicare is voluntary as a matter of *federal* law." *Id.* at 666.[3]

Louisiana argued below that to avoid its forced-sale regime, AbbVie can simply withdraw from the entire 340B Program *and* Medicaid. But AbbVie's participation in Medicaid is already the predicate for its participation in the broader 340B Program—*i.e.*, Louisiana offers nothing over and above what AbbVie already receives.[4] "A voluntary exchange

---

[3] The court ultimately concluded the state was immune from suit under the Eleventh Amendment for reasons not even arguably present here.

[4] That the State can make its voluntary participation argument only by reference to federal programs and requirements provides further confirmation, discussed

for a benefit" "does not exist" "if the purported 'benefit' is illusory." *Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1232 (D.C. Cir. 2023).

Further, the Supreme Court has rejected Louisiana's mode of reasoning. A State may not demand that private individuals part with their property as a condition of engaging in commerce. *Horne*, 576 U.S. at 366. That is because participating in commerce is "not a special governmental benefit that the Government may hold hostage, to be ransomed by the waiver of constitutional protection." *Id.*

***Second***, even if this case were treated as a traditional voluntary-participation-doctrine case, Louisiana's law would fail because there is no nexus or rough proportionality between forced sales to pharmacies and AbbVie's decision to participate in federal programs. The unconstitutional conditions doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013).

---

*supra* at §I, that the State is inappropriately meddling in a wholly federal universe.

When evaluating whether the government has abused its power to add conditions to the receipt of a benefit, courts ask the threshold question "whether the condition would qualify as a taking if the government had directly required it." *Knight v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 67 F.4th 816, 825 (6th Cir. 2023). Absent voluntary agreement, it is beyond dispute that Act 358's command to transfer property or suffer significant penalties would constitute a taking.

The next two inquiries are (1) whether there is an "essential nexus" between the conditions that attach to the benefit and the governmental interest justifying those conditions and (2) whether the conditions on receiving the benefit have a "rough proportionality" to the supposed impact on governmental interests that is caused by the party's receipt of the benefit. *Sheetz v. Cnty. of El Dorado, Cal.*, 601 U.S. 267, 275 (2024). For example, "if a proposed development will 'substantially increase traffic congestion,' the government may condition the building permit on the owner's willingness 'to deed over the land needed to widen a public road.'" *Id.* at 274-75 (citation omitted). These requirements recognize that a property owner threatened with certain conditions is "likely to

60

accede to the government's demand, no matter how unreasonable" so long as he values the intended use of the property more and thus serve to prevent "an out-and-out plan of extortion." *Id.* at 275 (citation omitted).

Act 358 fails at both steps. It requires that as a "condition" of AbbVie agreeing to provide significant discounts and rebates on medication through programs like 340B and Medicaid, it must now agree to extend those discounts to for-profit pharmacies in Louisiana. And this condition remains voluntary, the Attorney General says, because AbbVie can avoid it by withdrawing from the federal 340B and Medicaid programs *nationwide*—thereby impacting every patient in the country that accesses an AbbVie medication through those programs.

There cannot be a nexus between AbbVie's participation in *federal* healthcare programs that exclude for-profit pharmacies and Louisiana's insistence that AbbVie transfer discounted drugs to those same pharmacies. Even less so is there a rough *proportionality* between those two things. *See, e.g.*, *id.* at 276. There is no negative impact on Louisiana from AbbVie agreeing to sell discounted medications through federal government programs that is remediated by compelled transfers to retail pharmacies. Yet that is how State frames its compulsory regime. This

61

Court should not approve that logic: It is one thing for Congress to set certain conditions, within reason, on a manufacturer's participation in Medicaid. It is something else altogether when a state leverages that participation to regulate constitutional rights "outside the contours of the program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013).

Stated plainly, the Fifth Amendment does not permit the State to wrench property from AbbVie and give it to another private party by pretending that transfer was a condition of participation in *federal* healthcare programs.

### D. The Regulatory Takings Doctrine Does Not Apply, But Even If It Does, AbbVie Still Prevails.

The district court's decision to analyze this case as a regulatory taking, *see* ROA.1523-ROA.1524, was error because the regulatory-taking analysis does not apply when a law physically appropriates property. In *Horne*, for example, the Court considered a takings challenge to a federal regulation requiring raisin farmers to set aside a percentage of their crop for disposition by a federal agency. The agency could then do with the raisins what it wished: sell them to private parties, donate them, release them to other growers, or simply dispose of them.

62

*Horne*, 576 U.S. at 355.  Though the raisin farmers retained an interest in any residual proceeds from sales of the raisins, the Court held this was a "clear physical taking," not merely a regulatory restriction on use, because of the Government took "actual … possession and control" of the raisins.  *Id.* at 360-62.

In a similar way, Act 358 does not merely affect the way that AbbVie uses its own property but requires that AbbVie actually give up its property to for-profit pharmacies who wish to "acqui[re]" it.  That constitutes a physical taking even if the transfer occurs at the behest of a state law or under the fiction that a covered entity is the one really doing the ordering.  Act 358 forces AbbVie to transfer its drugs to another private party, and it thus effects a physical appropriation of private property.  *See Cedar Point*, 594 U.S. at 149.  The regulatory-taking framework is thus inapposite.

Even if Act 358 does fall within the regulatory-taking framework, AbbVie satisfies the Supreme Court's *Penn Central* test.  Under that test, courts decide whether a regulation of property "goes too far" by considering (1) the economic impact of the regulation, (2) the extent to which the regulation has interfered with investment backed

expectations, and (3) the "character of the governmental action." *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978).

*First*, Act 358 has a significant impact on AbbVie. The law requires AbbVie to transfer millions of dollars in discounted drugs to commercial pharmacies or face significant penalties. Because Act 358 requires AbbVie to provide its drugs at steeply discounted 340B prices to an unlimited number of contract pharmacy arrangements, AbbVie will face the threat of millions of dollars in *forced* unnecessary discounts each year as a result of Act 358. *See* ROA.944 (¶14); ROA.1137.

*Second*, Act 358 interferes with AbbVie's investment-backed expectations. AbbVie invests in developing and manufacturing lifesaving drugs to sell them, generating profits that enable further investment into the development of more lifesaving and life-improving products. *See* ROA.75-ROA.76 (¶18). Act 358 interferes with AbbVie's investment-backed expectations by compelling AbbVie to transfer them to non-covered entities for pennies on the dollar. That necessarily inhibits AbbVie's ability to invest in the development of new drugs that improve patients' lives.

***Third***, the character of the government action here counsels in favor of finding a regulatory taking because it "amounts to a physical invasion" rather than simply "adjusting the benefits and burdens of economic life to promote the common good." *Lingle*, 544 U.S. at 539. Act 358 compels the actual, physical transfer of AbbVie's private property to commercial pharmacies—an obligation the 340B Program itself does not impose. Worse, it offends the fundamental constitutional principle that the government may not "forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central*, 438 U.S. at 123 (citation omitted).

The district court's analysis went awry when it reasoned that the "history of the Section 340B program and litigation surrounding it" suggested that regulations like Act 358 were "foreseeable." ROA.1524. In fact, the history cuts the other way. Regulations like Act 358 are unique in the 33-year history of the 340B program. Indeed, at the time of Act 358's enactment, AbbVie had a policy in place of limiting transfer of 340B drugs to contract pharmacies, while allowing hospital covered entities to designate one contract pharmacy within 40 miles. And policies such as AbbVie's were upheld by federal courts of appeals just recently.

65

*See Sanofi*, 58 F.4th at 706; *Novartis*, 102 F.4th at 463-64.  Further, it is difficult to imagine how state-based regulation and enforcement of the 340B Program was foreseeable when Congress created the program and endowed HHS with exclusive enforcement authority.  *See Astra*, 563 U.S. at 117.

The district court also erred when it applied *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) to this case.  The district court recalled that in *Monsanto*, the companies subject to the at-issue regulatory scheme were on notice of the government's at-issue practice of publishing sensitive data, and that precluded any claim by the plaintiffs that the regulatory scheme interfered with their reasonable investment-backed expectations.  467 U.S. at 1006-10.  But the Supreme Court has warned against an overly broad reading of *Monsanto*, and its unique factual and regulatory context.  "A case about conditioning the sale of hazardous substances on disclosure of health, safety, and environmental information related to those hazards is hardly on point" for a straight-up physical appropriation of a manufacturer's product.  *Horne*, 576 U.S. at 366.  Rather, the analysis in *Monsanto* is generally only relevant to "government conditions" related to "reasonable health and safety

inspections." *Cedar Point*, 594 U.S. at 161.  But Act 358 is not a law concerning health and safety inspections—it requires the transfer of discounted products to commercial pharmacies.  Any claim that it will lead to an increase in the availability of prescription drugs for Louisianans, or require that they pay less for them, has *no grounding* in the law's text or any evidence in the record.

## III.   INTERVENTION WAS IMPROPER.

The district court erred in concluding that Louisiana Primary Care Association was entitled to intervene because the Association does not have a real interest in this litigation and, even if it did, the Attorney General adequately represents that interest.

As an initial matter, the Association has no right to enforce Act 358 or the 340B Program, so it has no interest in the subject matter of this litigation.  The Supreme Court has made clear that the 340B statute itself forecloses any effort at private enforcement of the Program's requirements.  *See Astra*, 563 U.S. at 119, 122.  Rather, any complaints the Association or its members have about manufacturers' contract-pharmacy policies must proceed through the federal ADR process.  The Association thus could not file a private suit to implement either statute's

67

requirements.  It accordingly has no interest in this proceeding to protect.[5]

Next, the Association must meet a heightened showing of inadequacy because it is the State defending Act 358's constitutionality. When the State is the party whose representation is said to be inadequate, this Court requires a heightened showing of inadequacy.  *See Hopwood v. State of Texas*, 21 F.3d 603, 605 (5th Cir. 1994).  That means Louisiana Primary Care must demonstrate that its "interest is in fact different from that of the state and that the interested will not be represented by the state." *Id.* (citation omitted).  And separately, this Court has previously observed that "when the party seeking intervention has the same ultimate objective as a party to the suit, a presumption arises that its interests are adequately represented, against which the petitioner must demonstrate adversity of interest, collusion, or nonfeasance." *Wade*, 743 F.2d at 240-41 (citation omitted).

Under this standard, the Association has not demonstrated that the State will not adequately represent its purported interests in *"this*

---

[5] Simply making less money as a result of a policy is the kind of generalized economic harm that is insufficient to satisfy Rule 24(a)'s interest requirement. *See New Orleans Pub. Serv., Inc.*, 732 F.2d at 470.

proceeding." *Bush*, 740 F.2d at 356. Both the State and the Association seek to uphold Act 358. And both the State and the Association make the same essential arguments about the nature of the 340B Program and the Louisiana law to achieve that end. Indeed, the Association made no claim in the district court that its objective in this proceeding, or its view of the controlling law, differ from the State's.

Below, the Association made two separate points to show inadequacy of representation, none of which withstands scrutiny. ***First***, the Association complained of a Louisiana regulation that works to prevent duplicate 340B and Medicaid rebates.[6] But the Association did not explain (nor could it) what bearing that regulation has upon the current proceeding. At most, the Association establishes that it wishes the State did less to prevent illegal duplicate discounts. That, though, has zero connection to whether the State can adequately defend Act 358's constitutionality. ***Second***, the Association also complained that the State has not yet "promulgated rules to implement Act 358" and that the State has not yet taken any enforcement actions under Act 358. What

---

[6] *See* La. Dep't of Health, Bulletin No. 16-9, 340B Policy Clarification (Jan. 6, 2023), https://tinyurl.com/av7cyaws.

the Association did not explain is why these observations (even if they are true) establish that the State will not adequately represent the Association's interest in upholding the constitutionality of Act 358. They show, at most, that the State's enforcement priorities differ from the Association's. That is insufficient for intervention.

## CONCLUSION

The district court's orders should be reversed.

Date: January 9, 2025

Respectfully submitted,

Ashley C. Parrish
John D. Shakow
KING & SPALDING LLP
1700 Pennsylvania Avenue N.W.
Suite 900
Washington, DC 20006
(202) 626-2627
aparrish@kslaw.com
jshakow@kslaw.com

Nicole Bronnimann
KING & SPALDING LLP
1100 Louisiana, Suite 4100
Houston, TX 77002
(713) 276-7402
nbronnimann@kslaw.com

*/s/ Matthew S. Owen*
Matthew S. Owen, P.C.
Meredith M. Pohl
Lucas H. Funk
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, DC 20004
(202) 389-5000
matt.owen@kirkland.com
meredith.pohl@kirkland.com
lucas.funk@kirkland.com

Charles M. Jarrell (No. 17638)
GUGLIELMO, LOPEZ, TUTTLE,
HUNTER & JARRELL, L.L.P.
306 East North Street
P.O. Box 1329
Opelousas, LA 70571-1329
(337) 948-8201
cjarrell@glthj.com

*Counsel for Appellants*

## CERTIFICATE OF SERVICE

This is to certify that the foregoing brief has been served via the Court's CM/ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on January 9, 2025, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

*/s/ Matthew S. Owen*
Matthew S. Owen, P.C.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of FED. R. APP. P. 32(A)(7)(B) because it contains 12,891 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f) and Fifth Circuit Rule 32.2.

This brief also complies with the typeface requirements of FED. R. APP. P. 32(A)(5) and the type requirements of FED. R. APP. P. 32(A)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century font 14-point typeface.

*/s/ Matthew S. Owen*
Matthew S. Owen, P.C.